# Exhibit 1

## DECLARATION

I, Richard Donahue, declare under penalties and pains of perjury as follows:

1. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and have been so employed for approximately six years. In that capacity, I investigate violations of the federal firearms statutes and related narcotics violations. I make this declaration in support of a motion to obtain a DNA sample, in the form of a buccal swab, from the person of JEROME COLEMAN in connection with the case captioned United States v. Jerome Coleman, Crim.No. 06-10239-RCL.

2. In June and July 2004, ATF and the Drug Enforcement Administration ("DEA") were investigating the criminal activities of Jerome Coleman. On June 16, 2004, Coleman sold a cooperating witness ("CW") two ounces of cocaine for $1,800 on Sever Street in Boston. The transaction occurred in Coleman's work van; surveillance by DEA and ATF placed Coleman in the van before and after the transaction, and photographs were taken of Coleman and the CW while they were in the van. The transaction was also audio recorded.

3. On June 28, 2004, Coleman sold the CW five ounces of cocaine for $4,650 on Cambridge Street in Alston. Again, this transaction occurred in Coleman's work van, and surveillance by DEA and ATF agents placed Coleman and the CW together outside the van and in the van at the time of the transaction. Moreover, Coleman was observed carrying the bag containing the narcotics to the van, while the CW carried the bag containing the narcotics from the van. The transaction was also audio recorded.

4. On July 2, 2004, Coleman sold five ounces of cocaine to the CW for $4,650 on Babcock Street in Brookline. A DEA undercover agent drove the CW to the meet location, and observed the CW meet with Coleman outside the van. Coleman and the CW then left the undercover agent's sight. A short time later, the CW came back to the undercover's car with a bag containing five ounces of cocaine. The CW had intentionally shorted Coleman money so that the undercover could be introduced to Coleman and provide the balance of the funds. Coleman then got into the undercover's

1

car and was introduced by the CW. The undercover asked Coleman what was in the bag, and Coleman replied that there were "five." The undercover then discussed the money the CW had provided Coleman, and then provided to Coleman the balance of $1,000. The transaction was also audio recorded.

5. A forth transaction, initially planned for ten ounces of cocaine and a Taurus firearm, was scheduled for the afternoon of July 15, 2004 in Cambridge near the Galleria Mall. In the days preceding the transaction, the CW spoke with Coleman about purchasing a firearm. In one recorded call, after the CW told Coleman that he did not want a "power tool" (firearm) that was "dirty," Coleman told the CW that it had never been triggered. In a subsequent call Coleman told the CW that the weapon was a Taurus. In other recorded calls before the transaction, the men negotiated the price for the "power tool" and the CW asked if it came with "nails." Coleman replied in the affirmative.

6. Coleman showed up late for the meeting in Cambridge on July 15, 2004. In addition, before arriving, he called the CW who was in the presence of the undercover agent and told him that he couldn't get the full ten ounces of cocaine that was agreed upon: in one call he told the CW it would only be five ounces; in a subsequent call he said it would only be three ounces.

7. After the calls on July 15, 2004, the undercover agent, surveillance agents, and the CW observed Coleman on foot approaching the CW and the undercover agent. Surveillance agents saw Coleman carrying a "weighted" distinctive blue and white bag to the meet location. Before Coleman reached the CW and the undercover officer, Coleman turned and fled from the scene. In a telephone conversation approximately 10 minutes after he ran, Coleman told the CW that he thought he saw a cop car at the purchase location. In that first call, Coleman asked the CW to meet him at the Twin City Mall on the Cambridge/Somerville line. In a call shortly thereafter, Coleman told the CW to "lose his number" and hung up the phone.

8. An ATF agent observed Coleman's car near the Twin City Mall and began to follow it. However, the agent lost the car near the intersection of Beacham Street

and Route 99 in Everett. The Malden Police stopped the car a short time later when it entered that city. Coleman's car was searched and neither the blue and white bag nor the firearm nor any cocaine was found.

9. On July 19, 2004 – four days after the aborted transaction – a maintenance worker for the Sprague Energy Corporation at 43 Beecham Street in Everett, MA, discovered a blue and white plastic bag matching that carried by Coleman near the Galleria Mall on July 15, 2004. The Sprague facility is located a short distance from where the ATF agent lost sight of Coleman's car on July 15, 2004. In the bag, which was discovered in the bushes outside the Sprague facility, was a loaded .357 caliber Taurus handgun, 20 additional rounds of ammunition (for a total of 25 rounds), and three ounces of cocaine. In addition to the contraband, the bag also contained a worn pair of Nike athletic shoes (Size 10), an unlaundered sports jersey, and a towel.

10. On or about January 23, 2007, I brought the shoes, jersey, and towel recovered from the bag outside the Sprague facility to the Massachusetts State Police Forensic Laboratory in Danvers, Massachusetts for analysis. On March 29, 2007, I received the results of the initial analysis. I also spoke with the chemist who performed that initial analysis. Specimens were taken from the sports jersey, the shoes, and the towel, and the analyst concluded that there was a high probability that one or more of the specimens contain a DNA profile.

11. In addition, I have determined that Coleman was wearing size 10 shoes on the day he remanded to the custody of the United States Marshals. The size 10 shoes he was wearing on the date of his arrest are currently stored in the Plymouth House of Corrections property room.

12. A sample of Coleman's DNA is necessary for comparison to the specimens recovered from the three pieces of evidence found at the Sprague facility and submitted to the State Police Crime lab. A sample of Coleman's DNA can be taken by swabbing the interior of Coleman's cheek with a sterile cotton swab; this is known as taking a buccal swab. This procedure is minimally invasive; no skin is broken, nor is blood drawn.

3

The procedure will be performed by a certified Massachusetts State Police chemist using a standard Massachusetts State Police DNA collection kit. The procedure will be performed at the Plymouth County House of Corrections where Coleman is currently in the custody of the United States Marshals Service.

      13. Based on the foregoing, I believe that probable cause exists to conclude that the bag recovered outside the Sprague Electric Company on or about July 19, 2004, and its contents, were in the possession of Jerome Coleman on July 15, 2004. I also believe that probable cause exists to conclude that one or more items in that bag contain DNA, and that it is necessary to obtain Coleman's DNA for purposes of comparison. Finally, I believe that probable cause exists to conclude that Coleman's DNA constitutes evidence of a crime. Signed under penalties and pains of perjury.

                                                                       _____ 4.4.07
                                                                         Richard Donahue
                                                                         Special Agent